MARYLAND CASUALTY CO. v. TUCKER.

*96 P. 2d 80.*

No. 28927.   Oct. 31, 1939.

W. E. Green, J. C. Farmer, and Robt. J. Woolsey, all of Tulsa, for plaintiff in error.

Charles W. Selby, of Sapulpa, J. Robert Ray, of Bartlesville, and James W. Cosgrove, of Tulsa, for defendant in error.

CORN, J. This is an appeal from a judgment rendered against the plaintiff in error, defendant below, in the district court of Washington county, in an action brought by defendant in error, plaintiff below, to recover upon a fidelity bond upon which the plaintiff in error was surety.

Plaintiff was county sheriff of Washington county. His deputy, Greenwood, gave a $1,000 bond upon which defendant was surety. Greenwood embezzled certain funds, and in March, 1934, plain-tiff notified defendant's representative Woods, from whom the bond had been purchased, that there would probably be a loss under the bond. Woods then volunteered to look after the matter of notifying the defendant. The evidence reveals plaintiff had lost his copy of the bond, and although he requested either the original or a copy of such bond, it was not furnished him.

Having information concerning a possible loss, defendant's agent went to Bartlesville to investigate the matter. At the time the books and records were being audited and it was impossible to ascertain the exact amount of the loss. Defendant's agent then talked to plaintiff and they agreed, inasmuch as the exact amount of the loss could not then be determined, to let the matter "ride" until the amount of the loss could be established.

April 2, 1934, defendant's claim agent wrote plaintiff and enclosed forms for making proof of loss, the letter stating they were "for your convenience in filing claim against the bond of J. M. Greenwood."

October 29, 1934, suit was brought against plaintiff, in behalf of the state, to recover upon his official bond, and October 3, 1936, a judgment in the amount of $2,400 was rendered against plaintiff and his bondsman. January 24, 1936, Tucker's attorneys wrote to defendant and asked for protection under the Greenwood bond. February 6, 1936, defendant wrote and denied liability on the grounds no proof of loss was filed within the required time, and for other reasons.

Thereafter plaintiff brought the present action, the case being tried upon plaintiff's amended petition, in which plaintiff alleged the facts of the loss; that he had no knowledge of the terms and conditions of the bond, though same were known to defendant's agent, and that by reason of the circumstances and actions of defendant the terms and conditions of the bond were waived; further, plaintiff became personally liable to

Washington county, defendant therefore became liable to plaintiff for $1,000 on this bond.

The jury returned a verdict for plaintiff for $1,000. From this verdict and judgment the defendant has appealed. Numerous assignments of error are presented, but for the purpose of this appeal it will only be necessary to decide whether the defendant waived the provision of the bond requiring proof of loss to be made.

As pointed out by defendant, it is a settled principle that proof of loss must be made, unless the insurance company waives this requirement by its actions or conduct. Aetna Ins. Co. v. Jackson et al., 177 Okla. 345, 60 P. 2d 210.

The record discloses plaintiff learned of the likelihood of a shortage in Greenwood's accounts, and thereupon sought to find the bond, but was unable to do so. Plaintiff then sought out defendant's local agent, who took care of the first notice, but was unable to furnish plaintiff with the bond or a copy. Defendant's claim agent then called upon plaintiff and discussed this matter with him, but did not inform plaintiff of the requirement concerning the proof of loss.

The evidence in behalf of the plaintiff, quoting only the pertinent portions, was as follows:

(Direct examination of plaintiff, p. 84):

"A. Well, there was a gentleman came in my office. Well, it was later I would say about a week later and represented himself to be Mr. Wachter. Q. Please state what, if any, conversation you had with the gentleman who appeared? A. Well, he came in and represented—came in as a representative of the Maryland Casualty Company and immediately we got into a conversation of the purported shortage of Greenwood, and I believe he asked me what I knew about it and I informed him at that time that I had been up to the courthouse and had attempted to find out all I could about it, but they was still checking on the books and the audit hadn't been completed. Q. What, if anything, did he say to you about what

he had done or what he would do? A. Well, he told me that he had been to the courthouse but hadn't made a thorough check, but was going back. Q. And did this gentleman come to see you on more than one day? A. He came back the next morning. Q. Well, please state whether or not he made any statement to you on either of those visits concerning the amount of the shortage? A. Well, I don't remember whether he came out on the exact amount. Q. Well, I know, but what did he say with reference to that? I know there wasn't anybody who knew at that time what the exact amount was. * * * Q. Then, Mr. Tucker, when the gentleman talked to you the next day what was the final understanding and agreement, if any, between you and him? Mr. Green: Object. It is calling for a conclusion. The Court: Sustained. By Mr. Cosgrove: Q. What did he say to you as near as you can give his words and what did you say to him as near as you can give your words? A. When he came back the second day he said he had checked all the records he could and had checked through the courthouse and that the audit wasn't completed and you couldn't determine the exact amount of the shortage, but there was going to be a shortage and at the time that he left he said, 'We will just let this matter ride and when we determine the exact amount of the shortage, we will get together on it.' Q. Did you agree or disagree about that? Did you say that you would do what he suggested or say you wouldn't do what he suggested? A. Well, to me that was as fair as a man could be. Q. Was that satisfactory to you? A. It was perfectly satisfactory with me."

(Plaintiff's re-direct examination, p. 108):

"The Witness: Well, just before Mr. Wachter left he said, 'We will just let this matter drop until there is more developed or we can find exactly the amount of the loss.' I would like to correct that. I don't believe he said 'drop'. I believe he said, 'We will let this matter ride'. I believe that is his language. By Mr. Cosgrove: Q. Let it ride until when? A. Until we determine the amount of the loss. Q. Did he state whether or not at that time there was any loss at all, or did he just merely want to determine the amount of it? (To this an objection was sustained.) Q. Wait a minute. Please state why you didn't comply with Mr.

Wachter's offer as communicated to you in the letter that has been presented to you enclosing the blank for proof of loss? Mr. Green: We object to that for the reason it is repetition and incompetent, irrelevant and immaterial. The Court: Well, I believe the witness has not stated just why he hasn't answered the letter and submitted Proof of Loss. He may answer. Mr. Green: Exception. The Witness: Well, Mr. Wachter and I—my understanding was that I wasn't to turn in a Proof of Loss until I knew the exact amount of the loss. Mr. Green: We ask that that be stricken as a conclusion and not a statement of fact and the jury be admonished not to consider it. The Court: That will be overruled. Mr. Green: Exception. The Court: He is stating what his idea is of what Mr. Wachter said. Might be justified and might not. That is for the jury."

Opposed to this testimony is that of defendant's agent, who, after stating he talked to plaintiff only once, further testified on direct examination (p. 123):

"Q. Will you tell this jury, please, sir, what you did and what was said between you and Mr. Tucker the time you saw him in Mr. Woods' office on March 23, 1934? A. As near as I can recall the conversation, Mr. Tucker related to me that he had learned that Mr. Greenwood, who was deputy sheriff under him, had been involved in transactions concerning the collecting of delinquent taxes. He said he thought at the time there would be a loss. He understood there would be a suit under his bond as sheriff of Washington county. In that event, he wanted to make claim against our bond. I told Mr. Tucker at that time when I returned to Tulsa, Okla., I would submit to him proof of loss. That I had no authority whatsoever to investigate or go into the merits of a case that is embezzlement charges against Greenwood because we hadn't been provided sworn statement of loss. We weren't permitted to go into the merits before the assured filed sworn statement of loss, or proof of loss."

This witness then testified to furnishing plaintiff with forms for making proof of loss, and the evidence showed plaintiff was informed by letter that these forms were for his convenience in filing claim against the Greenwood bond.

Consideration of the record discloses that when defendant's agent called on plaintiff the amount of loss could not be determined, and it was agreed that the matter lie dormant until it became possible to ascertain the extent of plaintiff's loss. This, obviously, could not be determined until the matter between the county and the plaintiff, in respect to Greenwood's embezzlements, was finally settled. Audit would not establish plaintiff's loss, since Greenwood could have either made restitution or filed additional returns which might have changed facts of audit.

It is the defendant's contention there was no waiver of the requirements that plaintiff supply the proof of loss, defendant pointing out that proof of loss was to be filed later, when the audit was completed. We are unable to agree with the argument in this connection, since it became a question of fact as to the meaning to be given to defendant's action and conduct, although defendant insists that, at most, this requirement was only waived until the audit was completed. The plaintiff's evidence was that defendant's agent told him:

"We will just let this matter ride and when we can determine the exact amount of the shortage, we will get together on it."

The record shows that after the judgment for $2,400 was secured against plaintiff the defendant made no effort to adjust the plaintiff's claim, but denied any liability upon the grounds that no proof of loss had been furnished.

We recognize the correctness of the rule as laid down by the authorities offered in behalf of defendant that the furnishing of proof of loss is neither a minor part of the contract nor a technicality. However, we are unable to give to these authorities the prominence they deserve as abstract principles of law, in view of the interpretation which must necessarily be placed upon the conduct and course of events which transpired here.

From the record we are unable to conclude otherwise than that the plaintiff

was led to believe that after the loss was established the defendant would attempt to "get together with him" on the matter, and then, if necessary, he could make the proof of loss, plaintiff being led to believe this solely because of defendant's conduct in the matter.

This court has consistently held that sufficiency of evidence to sustain a judgment is to be considered in the light of the evidence tending to support the judgment together with the reasonable inferences deducible therefrom, rejecting the evidence of the adverse party in conflict therewith. See Missouri-K.-T. Ry. Co. v. Embrey, 168 Okla. 433, 33 P. 2d 481; Id., 79 L. Ed. (U. S.) 695, and Tull v. Milligan, 173 Okla. 131, 48 P. 2d 835.

Decisions too numerous to require citation announce the rule that where, in a civil action triable to a jury, there is any evidence reasonably tending to sustain the verdict, same will not be disturbed. The evidence was conflicting upon the question of waiver in the case at bar and there being evidence reasonably tending to support the verdict of the jury we decline to substitute our judgment for that of the jury.

Judgment affirmed.

BAYLESS, C. J., WELCH, V. C. J., and HURST and DAVISON, JJ., concur.